**FINANCIAL GUARANTY INSURANCE COMPANY, Plaintiff,**

v.

**The CITY OF FAYETTEVILLE, ARK., et al., Defendants.**

**Civ. No. 90–5052.**

United States District Court, W.D. Arkansas, Fayetteville Division.

Oct. 5, 1990.

Larry W. Burks, Friday, Eldredge & Clark, Little Rock, Ark., Brian S. Fraser, Robert S. Rifkind of Cravath, Swaine & Moore, New York City, for plaintiff.

Walter R. Niblock, Katherine C. Gay, Niblock Law Firm, Fayetteville, Ark., Steven F. Pflaum, McDermott, Will & Emery, Chicago, Ill., Thomas M. Ingoldsby, McDermott, Will & Emery, Washington, D.C., for defendant City of Fayetteville, Ark.

George E. Butler, Jr., Washington County Atty., Fayetteville, Ark., for defendant Washington County, Ark.

Jerome J. Paddock, Jr., Fayetteville, Ark., for defendant City of West Fork, Ark.

Jim Rose, III, Fayetteville, Ark., for defendant Northwest Arkansas Resource Recovery Authority.

Kent Hirsch, Springdale, Ark., Marshall Dale Evans, Fayetteville, Ark., for defendants Vickie Kelley, Katherine E. Barnhart and Carl Brooks.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### Facts

In the early 1980's, the City of Fayetteville and other governmental units in the Northwest Arkansas area began consideration of alternatives to solid waste disposal utilizing land fills. On August 30, 1980, Northwest Arkansas Resource Recovery Authority (hereinafter referred to as "the Authority") was formed under the provisions of Act 699 of the Acts of Arkansas, an act known as the Joint County and Municipal Solid Waste Disposal Act. Ark. Code Ann. § 14–233–101 (1987) *et seq.* The initial members of the Authority were the cities of Fayetteville and West Fork. Washington County later became a member. The Authority was directed by a nine-member board of directors, seven of whom were also members of Fayetteville's board of directors with West Fork and Washington County each appointing one director.

The purpose of the Authority was to finance, plan and construct an incinerator in which solid waste generated by the citizens of the governmental units would be burned. Initially, the plan was to use the heat generated by the incinerator to produce steam for sale to the University of Arkansas or other entities. When that plan did not materialize, it was decided that the heat would be used to generate electricity and sales arrangements were made with public utilities in the area.

In 1985, the Quorum Court of Washington County and the governing bodies of the two cities approved ordinances which authorized the Authority to issue up to $25,-000,000 in Solid Waste Management Revenue Bonds, Series 1985. On December 31, 1985, the Authority issued bonds totaling $22,405,000.00 with the proceeds to be used to finance the development and construction of the project. Because much of the development work, including site selection, preparation of a satisfactory feasibility study, negotiation of contracts and procurement of federal, state, and local permits and licenses had not been completed

at the time the bonds were issued, the proceeds were placed in an escrow account until the project could be completed sufficiently to properly utilize the funds generated. The bond proceeds held in escrow were invested in United States Government obligations and the interest earned was sufficient to pay the interest accruing on the bonds as well as certain expenses that had been incurred to that point.

Beginning in early 1986, the development progressed to the point that the Authority entered into a construction and management contract with the contractor that had been chosen to plan, build, and operate the facility. Additionally, in late 1986, the City of Fayetteville acquired by condemnation a site for the project known as the "Happy Hollow" site. Because the project had now developed to the point that funds could be utilized, on December 30, 1986, the bonds were remarketed as fixed rate bonds and proceeds of $22,405,000.00 were made available.

As a condition to the issuance and remarketing of the bonds, Financial Guaranty Insurance Company (FGIC) insured repayment of the bonds. Under the policy, FGIC is obligated to pay any principal or interest on the bonds if the Authority does not pay such principal or interest when due. In that event, FGIC shall become the owner of the bonds evidencing the indebtedness paid or the right to payment of principal or interest on such bonds, and shall be fully subrogated to all of bondholders' rights.

As a condition to the issuance or remarketing of the bonds and the issuance of the insurance policy, a memorandum dated December 23, 1986, signed by Marian R. Orton, chairman of the Authority board, and a member of the Fayetteville board of directors, was issued and distributed to potential purchasers of the bonds. The memorandum represented that the members of the Authority would agree in a specified agreement to pay tipping fees sufficient to cover all operating expenses and financing requirements of the Authority. Additionally, also as a condition to the issuance of the bonds and insurance policy, it was required

that an opinion of counsel directed to the trustee, Union National Bank of Little Rock, be issued, and such an opinion letter was received from James McCord, the then city attorney. The opinion letter stated that it was the attorney's opinion that the City of Fayetteville was unconditionally obligated under the terms of a contract known as the "Waste Supply Agreement" entered into on December 22, 1986, to charge, collect and pay from sanitation fund revenues all tipping fees due under the agreement not only owed as a result of the waste generated by the City of Fayetteville but also any such fees not paid by the other parties, and that this obligation continued whether the project was completed or functioning.

Construction of the project was begun in early 1987 and in January of that year public opposition to the incinerator grew. Initially, the opposition focused on the location of the project, but, as public opposition increased, environmental concerns and the effect on Fayetteville sanitation rates became central issues in the controversy. Apparently in an effort to quell the public outcry which had reached shrill proportions by this point, the authority and the cities proposed and considered alternate sites for the project but, in each instance, that only served to shift the focus of the public opposition to other locations in the area. On October 8, 1987, the Authority directed the contractor to place a moratorium on all discretionary spending.

Public opposition increased through 1987, and by early 1988, the "heat" focused on the Fayetteville board of directors apparently became too great to bear. The Fayetteville directors voted to place the issue of whether the incinerator should be built before the voters, and the voters were allowed to vote in a non-binding referendum held on March 8, 1988. Fifty-seven per cent of those voting voted against construction of the project and the next day the Fayetteville board of directors chose to withdraw from the project and the Authority was notified. On March 11, 1988, the Authority board voted to discontinue the project, and the contractor was directed to terminate all work. On March 15, 1988,

the trustee, Union National Bank of Little Rock, notified the Authority by letter that a default had occurred and FGIC was similarly notified.

According to the file in this case, notwithstanding the default, all payments on the bonds have apparently been made but, at least according to representations made by various attorneys for the parties, it is expected that funds for the payments due on December 31, 1990, cannot be made from funds in possession of the Authority. It appears that, at the time the project was canceled, in excess of $7,000,000.00 of the bond proceeds had been expended on unrecoverable costs.

The members of the Authority had agreed in the Waste Supply Agreement referred to above that each was to deliver certain specified amounts of solid waste to the project. Fayetteville contracted to deliver 33,565 tons of solid waste annually out of the total of 35,388 tons that the three members had collectively agreed to annually deliver. The agreement also contained terms and conditions for payment of tipping fees to the Authority and, since the tipping fees were the primary source of funds from which the Authority would pay principal and interest on the bonds, the obligations undertaken in the agreement were most important in supporting the issuance of the bonds and in making them saleable.

The agreement provided that the tipping fees were to be set at a rate sufficient to enable the Authority to pay debt service and operating expenses, and Fayetteville agreed to collect from residences and businesses charges for the disposal of solid waste at rates sufficient to enable it to pay the tipping fees. Additionally, as the primary motivator of the project and, in effect, the insurer, the City of Fayetteville agreed not only to pay the tipping fees which it was obligated to pay under the agreement, but also unconditionally guaranteed the tipping fee obligations assumed by Washington County and by West Fork. In § 401(e) of the agreement, the city agreed that its obligation to pay not only its tipping fees, but those of the other governmental units was "absolute and unconditional" and that they would be "maintained and collected without any offset, abatement, credit or deduction whatsoever."

Section 401(c) of the agreement provides that the obligation of the governmental units to pay the tipping fees shall be payable solely out of income received by the cities and the county from charges for the disposal of garbage and trash (sanitation fund revenues). However, because of an ambiguity in the agreement, it is not totally clear that the City of Fayetteville is obligated to pay tipping fees only out of sanitation revenue funds. That ambiguity and the possible problems created by it will be discussed below.

The Waste Supply Agreement was assigned by the Authority to Union National Bank of Little Rock for the benefit of the bondholders as security for payment of principal and interest on the bonds, and it is apparent that the agreement was the primary collateral for the bonds. The agreement also contains a provision specifically making the trustee a third-party beneficiary of that agreement.

Termination of the project and Fayetteville's attempted withdrawal from it by no means has doused the flames of discontent and controversy that have swept the city. This court could, if relevant, undoubtedly take judicial notice of the depth and breadth of the discontent and political controversies occasioned by the city's promotion of the project and its expensive and divisive demise. Area news media almost daily present stories of the difficult and expensive attempts by the city to extricate itself from this tangled web, with many citizens being genuinely alarmed about the seemingly astronomical expenses of withdrawal and litigation, including what appears, at least on the surface, to be unbelievably high legal costs, and the ultimate effect of these expenses on the taxpayers of the city.

In an attempt to fund these expenses and to repay the unrecoverable bond proceeds expended on the project, on August 15, 1989, the City of Fayetteville passed Ordi-

nance No. 3444 which substantially raised the rates paid by its citizens for trash pick-up and disposal. It appears from the ordinance that it supplements other ordinances or sections of ordinances which had previously been passed to authorize the collection of fees from its citizens for provision of these services. In other words, Ordinance No. 3444 appears to be, in effect, a surcharge on sanitation rates to collect funds to be utilized in paying the withdrawal expenses. In fact, the ordinance specifically provides that that is the purpose of it. Apparently, sanitation fees are also collected under §§ 10–28, 10–29, and 10–29.1 of an ordinance previously passed by the city providing for the collection of sanitation fees.

According to the motion by the city in this case to deposit a sum of money in the registry of the court filed August 6, 1990, it had collected by that time, through this surcharge, the sum of $541,187.29 represented by a certificate of deposit in a local bank, bearing interest at the rate of 7.911%. It appears that the city has continued to collect funds under the provisions of that ordinance since that time, and will do so, according to the ordinance, until the year 2003.

Passage of the ordinance and collection of the sanitation fee surcharge has caused the opposition of certain Fayetteville citizens to be shifted into multiple litigation in both state and federal courts. On August 28, 1989, a citizen filed a lawsuit in Washington County Chancery Court alleging, among other things, that the ordinance and the funds collected by it was an illegal exaction violative of certain provisions of the Arkansas constitution and Arkansas statutes. Since that time, it appears that that lawsuit has ballooned into an all encompassing claim by certain taxpayers and ratepayers, as alleged representatives of a class, that most of the actions described above taken by the City of Fayetteville were in violation of the Arkansas constitution and other applicable Arkansas law.

All of the parties to this lawsuit are also parties to the state court action and, according to certain filings made in this case

by the parties, that case is set for trial to begin on October 22, 1990, but there is some indication that one of the parties has appealed a class determination order made by the chancery court and has requested a stay pending a decision by the Arkansas Supreme Court on that issue. Apparently the City of Fayetteville has joined in the request for a stay.

### This Lawsuit

The lawsuit in this court was commenced on May 25, 1990, by FGIC filing a declaratory judgment and breach of warranty cause of action against defendants, the City of Fayetteville, the City of West Fork, Washington County, and Northwest Arkansas Resource Recovery Authority. FGIC claims that, although it has made no payments under the insurance policy to date, it will inevitably be called upon to make payments for the benefit of the bondholders. It purports to seek a declaration that the waste disposal agreement entered into between the Authority and the members is valid and enforceable and that the members are required to pay the tipping fees called for by that agreement.

The trustee, Union National Bank of Little Rock, was not a party to the lawsuit even though it is its obligation to collect from the Authority the funds necessary to pay the interest and principal when due. It appears from subsequent filings in the case that Larry Burks of the Little Rock law firm of Friday, Eldredge and Clark is also the attorney for the trustee. The cities of Fayetteville and West Fork, Washington County, and the Authority are defendants, and it is claimed that the court has jurisdiction by reason of complete diversity of citizenship and because the amount in controversy reaches the required jurisdictional amount.

Soon after the filing of the lawsuit, various persons claiming to be taxpayers and sanitation rate payers of the city of Fayetteville attempted to intervene. In response to some of these motions, the city filed a response advising that it would soon file an answer and counterclaim and that the "counterclaim in this lawsuit is intend-

ed to facilitate the resolution of all aspects of the controversy" involving the city's authority to pay sums due under the "Waste Supply Agreement." It advised in that pleading that it would make the alleged ratepayers parties to this lawsuit. The City of Fayetteville subsequently filed an answer and counterclaim and in its answer it either admitted most of the substantive allegations of the FGIC complaint or simply stated that the written documents "speak for themselves." It asserted that it did, in fact, have authority to enter into the Waste Disposal Agreement but pointed out that the enforceability of the agreement had been challenged in a taxpayer illegal exaction lawsuit filed in Washington County Chancery Court. It admitted that there was a "substantial, potentially imminent risk that FGIC will be called upon to make payments for the benefit of the bondholders."

In Fayetteville's counterclaim it recognizes that FGIC in its complaint contends that the city is obligated to pay the shortfall then, after also recognizing that the taxpayers in the chancery court action contend otherwise, it says that it "contends that, as a city of the first class with home rule powers under Arkansas law, it has the authority to pay the shortfall (and, hence, the authority to enact and use Ordinance 3444 for that purpose) for each of the following reasons:". It then sets forth several reasons why it agrees with the contentions of FGIC that it not only has the obligation but also has the authority to make the payments that FGIC seeks an order from this court compelling it to make.

Northwest Arkansas Resource Recovery Authority also answered the complaint, essentially as Fayetteville did, admitting the execution of the agreement and stating that the provisions of the agreement "speak for themselves." It is obvious that the Authority does not legitimately contest any of the allegations made by FGIC in the complaint.

It would not serve a useful purpose for this court to trace the long and tortuous course that this case has taken through a myriad of pleadings filed by the attorneys for the parties. Suffice it to say that this court now has before it all of the major players in this saga as does the chancery court in the state court action. That includes FGIC, the City of Fayetteville, the City of West Fork, Washington County, Northwest Arkansas Resource Recovery Authority, and various individuals claiming they are ratepayers and taxpayers of the City of Fayetteville representing others similarly situated.

There are presently pending before the court various motions to intervene and opposition to those motions, etc., but it would serve little purpose to specifically discuss or, in fact, rule on these motions, because, through counterclaims and other means, all of the parties named above are unquestionably now before the court.

The alignment of the parties, of course unilaterally made by them when their various pleadings were filed, will be discussed in more detail below. Additionally, there are several motions pending before the court, some of which will also be discussed below. Suffice it to say that what is now before the court is a request that this federal court determine whether the various actions taken by the governing body of the City of Fayetteville during the 1980's are valid and enforceable or whether, as contended by the taxpayers, those actions were in violation of various provisions of the Arkansas constitution and Arkansas statutes. There is no claim anywhere in this lawsuit that there is any federal question, and claimed jurisdiction is premised solely upon diversity of citizenship.

*Jurisdiction Generally*

Among the various papers filed by the attorneys for the claimed taxpayers and ratepayers are various motions to dismiss which, although not very clearly or cogently expressed, include claims that this court does not have subject matter jurisdiction. Since that is clearly the threshold question that must be determined by this court, it will now be addressed.

■ Of course, the law clearly is that the court not only has the right, but the obli-

gation and duty, even without a request from the other parties, to carefully consider the pleadings filed in this matter and to determine whether subject matter jurisdiction exists. If the court determines that it does not have jurisdiction, it is obligated, on its own motion if necessary, to remand the matter to state court or dismiss the case. *Fort v. Ralston Purina Co.*, 452 F.Supp. 241 (E.D.Tenn.1978); *Van Horn v. Western Electric Co.*, 424 F.Supp. 920 (D.C.Mich.1977); *Fischer v. Holiday Inn of Rhinelander, Inc.*, 375 F.Supp. 1351 (W.D. Wis.1973); *Sexton v. Allday*, 221 F.Supp. 169 (E.D.Ark.1963). Any action by a federal court which lacks subject matter jurisdiction is a nullity, and any party, even the party that invoked the jurisdiction of the court, can attack jurisdiction at any time even after judgment is rendered against him and even for the first time on appeal. *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951).

Our founding fathers, wisely in this court's view, provided that federal courts would be courts of limited jurisdiction. In this day and time, many of us, including many federal judges, seem to have lost sight of that fact, but it is still true. While many of us complain about intervention by federal judges in the affairs of our daily lives, we seem, at the same time, to want to "make a federal case" out of about every issue that bothers us. However, unless either the Constitution or federal law grants to federal district courts authority to hear particular cases, it has no power to do so. That power is instead, by our Constitution, vested in the state courts. That principle was eloquently explained in the landmark United States Supreme Court case of *Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76, 62 S.Ct. 15, 20, 86 L.Ed. 47 (1941). In that case, in realigning the parties and directing that the district court refuse jurisdiction, the court explained:

This is not a sacrifice of justice to technicality. For the question here is not whether Chase and Indianapolis Gas may pursue what they conceive to be just claims against the City, but whether they may pursue them in the federal courts in Indiana, rather than in its state courts. The fact that Chase prefers the adjudication of its claims by the federal court is certainly no reason why we should deny the plain facts of the controversy and yield to illusive artifices. Settled restrictions against bringing local disputes into the federal courts cannot thus be circumvented.

These requirements, however technical seeming, must be viewed in the perspective of the constitutional limitations upon the judicial power of the federal courts, and of the Judiciary Acts in defining the authority of the federal courts when they sit, in effect, as state courts. *See Madisonville Traction Co. v. Mining Co.*, 196 U.S. 239, 255 [25 S.Ct. 251, 257, 49 L.Ed. 462] [ (1905) ] and *Ex parte Schollenberger*, 96 U.S. 369, 377 [24 L.Ed. 853 [ (1877) ]. The dominant note in the successive enactments of Congress relating to diversity jurisdiction, is one of jealous restriction, of avoiding offense to state sensitiveness, and of relieving the federal courts of the overwhelming burden of 'business that intrinsically belongs to the state courts,' in order to keep them free for their distinctive federal business. *See Friendly, The Historic Basis of Diversity Jurisdiction*, 41 Har.L.Rev. 483, 510; *Shamrock Oil Corp. v. Sheets*, 313 U.S. 100, 108–09 [61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941) ]; *Healy v. Ratta*, 292 U.S. 263, 270 [54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934) ]. 'The policy of the statute [conferring diversity jurisdiction upon the district courts] calls for its strict construction. The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution.... Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined.'

*Indianapolis*, 314 U.S. at 76–77, 62 S.Ct. at 20–21.

■ With that unwavering constitutional principle in mind, the court will now examine the controversy presented by this case, not necessarily in the posture adopted by the parties through their pleadings, but, instead, it will consider the actual controversy and conflict and the actual alignment of the parties in respect to their apparent desire as to the ultimate results to be reached in this case. That is required by *Indianapolis v. Chase Nat. Bank, supra,* and numerous other cases including cases such as *Dryden v. Dryden* 265 F.2d 870 (8th Cir.1959). In that case, the court, quoting with approval from *Thomson v. Butler,* 136 F.2d 644 (8th Cir.1943), said:

> For purposes of testing the jurisdiction of a federal court on the basis of diversity of citizenship, it is immaterial how the parties may have been designated in the pleadings, since the court must align them for jurisdictional purposes on the basis of their actual legal interests and the apparent results to them if the object sought to be accomplished by the litigation is successful.

*Dryden,* 265 F.2d at 873.

In this respect, it is apparent to the court, for whatever reasons, and perhaps valid reasons, that the governmental units and the insurance carrier desire that this case be tried in this court rather than state court. It may be that that desire is justified in view of the emotionally charged political atmosphere in this area, particularly in view of the general belief that federal courts are more insulated from that atmosphere than are state courts, the judges of whom are elected.

In any event, for whatever reason, it is obvious to this court that those parties have earnestly and ingenuously attempted to manufacture jurisdiction in this court so that what is essentially a local matter can be decided here. They have done this by two means. First, FGIC, a New York corporation, filed an action that it called a declaratory judgment action, carefully avoiding any alignment of parties that would destroy diversity of citizenship.

It appears obvious that one of the parties that should be interested in insuring that the City of Fayetteville and other members of the Authority live up to the promises made by them in the various agreements would be the trustee, Union National Bank of Little Rock, since it is the entity responsible for collecting funds and paying the bondholders. However, as the lawsuit was initially filed, Union National Bank was conspicuous by its absence. It was later brought into the lawsuit by the City of Fayetteville and as the parties have aligned it through their pleadings, it is now denominated as a counterdefendant to the city's counterclaim. It is significant that, throughout these proceedings, it has been represented by the same lawyer that represents FGIC and even more significant, that, in its pleadings filed, it has in almost every instance simply adopted prior pleadings filed by FGIC. In this respect, it has generally simply said that it "respectfully adopts" FGIC's pleading, in essence saying that it agrees with whatever FGIC says about this lawsuit.

The other tact utilized by the parties who want the case heard in this court was for the City of Fayetteville to file what it claims to be an interpleader action. Of course, the law is that the requirements of diversity of citizenship in interpleader actions filed under the provisions of 28 U.S.C. § 1335 (1976) are considerably less stringent than such requirements in diversity cases filed under the general diversity of citizenship provisions of 28 U.S.C. § 1332 (1976). While this court has difficulty finding that in the Constitution, the United States Supreme Court has said that in such interpleader actions, only "minimal diversity between the claimants" is required. *State Farm Fire and Casualty Co. v. Tashire,* 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967).

### Diversity Jurisdiction

■ The court will first discuss whether it has subject matter jurisdiction under the required diversity provisions of 28 U.S.C. § 1332. As the Supreme Court said in *Indianapolis v. Chase Nat. Bank,* 314 U.S. at 69, 62 S.Ct. at 17:

To sustain diversity jurisdiction there must exist an 'actual,' *Helm v. Zarecor*, 222 U.S. 32, 36 [32 S.Ct. 10, 11, 56 L.Ed. 77 (1911)]; 'substantial,' *Niles–Bement–Pond Co. v. Iron Moulders Union*, 254 U.S. 77, 81 [41 S.Ct. 39, 41, 65 L.Ed. 145 (1920)], controversy between citizens of different states, all of whom on one side of the controversy are citizens of different states from all parties on the other side.

The court went on to say that diversity jurisdiction cannot be conferred upon the federal courts by the parties own determination of who are plaintiffs and who are defendants. It said that it is the duty of the lower federal courts to "look beyond the pleadings and arrange the parties according to their sides in the dispute" and that the court should insure that "[l]itigation is the pursuit of practical ends, not a game of chess." *Indianapolis*, 314 U.S. at 69, 62 S.Ct. at 17. The court said that, whether there is the necessary "collision of interests," is not to be determined by mechanical rules but, instead, is to be ascertained from the principal purpose of the suit and the "primary and controlling matter in dispute". *Id.* (Citations omitted).

When that is done in this case, it is obvious that the alignment of the parties does not correctly reflect their interests in this lawsuit and that, undoubtedly, the alignment was carefully crafted to attempt to manufacture federal court jurisdiction. What we have when this series of legal maneuverings is distilled to its essentials is citizens and taxpayers lined up on one side of the controversy, claiming to represent other citizens, contending that about everything that the City of Fayetteville did in respect to the incinerator project was illegal and void since the conduct violated both the Arkansas constitution and various state statutes. On the other side of the real controversy are the insurance carrier, the Cities of Fayetteville and West Fork, Washington County, the Authority, and the trustee, Union National Bank, all contending, in reality without dispute, that what Fayetteville did was valid and not in violation of the Arkansas constitution and Arkansas statutes. They, without real dis-

agreement among them, contend that the obligations assumed by Fayetteville are enforceable and that this court should so hold, ending not only this matter but thereby at least collaterally ending the litigation pending in state court.

It should be noted that realignment of any of the entities now denominated as defendants or counterdefendants to the same side of the lawsuit as FGIC will destroy diversity jurisdiction, at least the jurisdiction created by 28 U.S.C. § 1332. This court has no doubt that all of the governmental units should be realigned on the same side of the lawsuit as FGIC because there is no controversy between them and their object in this lawsuit is exactly the same.

If there is any doubt in respect to any of them, there should be none in respect to Union National Bank of Little Rock, since it has not even made a pretext that it disagrees with anything that FGIC has said in this lawsuit. As indicated, it has said, through the same lawyer, that it agrees with FGIC in respect to the issues in this lawsuit and that its desires as to the results to be reached are the same as the desires of FGIC.

In short, on one side of the lawsuit, and it makes no difference which side, are the taxpayers seeking to invalidate everything that has been done in respect to the incinerator project, and on the other side are the governmental entities and the insurance carrier seeking a declaration that those actions were valid. Thus, if there was ever a case in which the principles outlined in *Indianapolis v. Chase Nat. Bank, supra,* and *Dryden v. Dryden, supra,* and other cases, should be applied, this is it. This court does not have subject matter jurisdiction on the basis of the diversity provisions of 28 U.S.C. § 1332.

### Interpleader Jurisdiction

■ However, that holding does not end the question of whether the court has jurisdiction of this case because of the putative interpleader action which the City of Fayetteville has attempted to institute in these

proceedings and the lesser diversity requirements of the provisions of 28 U.S.C. § 1335, as interpreted by the Supreme Court. This Court, in a letter ruling dated September 4, 1990, held that interpleader was not available because there was no showing that there were "two or more adverse claimants" claiming against "the same fund."[1] Fayetteville has filed a motion to reconsider that ruling, and the following is the court's disposition of that motion.

On August 6, 1990, some 73 days after the lawsuit was filed by FGIC and after the taxpayers had sought to intervene and had raised jurisdictional questions, Fayetteville filed its motion to deposit $541,187.29 into the registry of the court. These funds were funds collected to that date from the sanitation fee surcharge imposed by the ordinance described above. The city had previously requested in its answer and counterclaim that it be permitted to interplead these funds and pay them into the registry of the court but it notably did not ask to be relieved of all further liability in the case. Instead, it asked for the court to determine that its actions had been valid in respect to the incinerator project and for a declaration upholding its authority to pay the shortfall for several reasons enumerated in the counterclaim.

As requested the court has reconsidered its earlier ruling and after giving the matter careful consideration and after engaging in substantial additional research, it is more convinced than before that the city is attempting to make a "federal case" out of an essentially local matter involving an interpretation of city ordinances, state statutes, and the Arkansas constitution.

This is not an interpleader action in which the City of Fayetteville has attempted to interplead funds into the registry of the court because it believes that it may be exposed to double liability by the various claims made against a common fund. Instead, it is a clear attempt by the city to invoke federal court jurisdiction simply because it would rather have this matter heard here. It desires that this court assume jurisdiction, and it has requested by motion that this court enjoin all the parties from litigating the issues in any other court, including, of course, the lawsuit now pending and apparently close to trial in chancery court. That is an inappropriate and improper use of interpleader.

■ As is succinctly pointed out in 7 C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure* § 1704 (2d Edition 1986), the proper purpose for interpleader is to afford "a party who fears he will be exposed to the vexation of defending multiple claims to a limited fund or property that is under his control a procedure to settle the controversy and satisfy his obligation in a single proceeding." It is clear that that traditional test has not been met in this case. In the first place, there is no common fund which can be paid into the registry of the court about which the claimants can fight and end this litigation. If the court allows the $541,187.29 to be paid into the registry of the court, it cannot then allow the City of Fayetteville to walk away, and the city has not asked that it be allowed to. Distribution of that fund will not satisfy anyone and will certainly not accomplish the purposes of this litigation. The court will still be faced with all of the issues in respect to the validity of the actions taken by the City of Fayetteville, and the validity of the collections that will continue to be made under the provisions of Ordinance No. 3444. The distribution of

---

**1.** The court also quoted verbatim from a statement in *Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 72, 60 S.Ct. 44, 48, 84 L.Ed. 85 (1939) that there must be a showing of "... applicant's disinterestedness as between the claimants and as to the property in dispute, an essential in interpleaders", and indicated that there was a failure by the City of Fayetteville to show that it was disinterested in this case. In a motion to reconsider, the city contends that this court's reliance on *Treinies* for that proposition is mis-

placed and that such a requirement does not now exist in the law. The court agrees. That does not mean, however, that an interpleading party can manufacture federal court jurisdiction by taking sides and only pretending that it is a disinterested stakeholder when, in fact, it is not. The court recognizes that it did not carefully and accurately state its conclusion in respect to how it believes disinterestedness or lack of it affects a party's right to invoke interpleader.

that sum to the claimants will not settle anything, and all of the complicated legal issues will remain both in this court and in the chancery court proceeding.

In any event, even if this court should consider the sum that the City of Fayetteville seeks to pay into the registry of the court as a "common fund" there are no adverse claimants to that fund. The argument between the parties is not who should receive the funds but whether there should be such a fund. Fayetteville, FGIC, the Authority, and Union National Bank all agree that those funds must be paid to the trustee to be utilized to carry out the obligations of the trustee to pay the bond interest and principal when due. The taxpayers do not contend that they are entitled to those funds but instead contend, among other things, that those funds were illegally exacted from the taxpayers and should be returned from whence they came.

■ As we pointed out in our letter opinion, interpleader will normally not lie where the "stakeholder" may be liable to two or more sets of claimants or where he faces only a potentiality of double liability. *See* 7 C. Wright, A. Miller and M. Kane, *Federal Practice & Procedure* § 1705 at p. 509 (2d Edition 1986). *See also General Elect. Credit Corp. v. Grubbs,* 447 F.2d 286 (5th Cir.1971); *Center Partners Management Ltd. v. Cache, Inc.,* 657 F.Supp. 48 (S.D. Fla.1986). It is entirely possible that the taxpayers win but that Fayetteville is still liable to make the payments it agreed to make in the Waste Supply Agreement.

In this respect, in its motion for reconsideration, Fayetteville contends that, in ruling that there was no common fund against which adverse claimants were claiming, the court failed to recognize that the Waste Supply Agreement provides that the city was obligated to make tipping fee payments only out of income received from receipt of sanitation fees charged the citizens—the common fund generated by Ordinance 3444. It argues that, for that reason, the money that the City of Fayetteville has attempted to pay into the registry of the court is, in fact, a distinct fund, and

that the court, in saying that Fayetteville might still be liable to make payments pursuant to the obligations assumed by it in the agreement, was incorrect. That contention is specious.

The court should first point out that it is not totally clear, as already indicated, that the city's obligations are limited even to sanitation fee funds. That is because, while the provisions of § 401(c) of the agreement contains that restriction, there is no such restriction in the provisions of § 401(d) in which the city "unconditionally agrees and guarantees" to pay all tipping charges by any members of the authority if they are not paid by those members as required by the agreement, or in § 401(e) in which the city agrees that its obligations "shall be absolute and unconditional, and such tipping fees shall be maintained and collected without any offset, abatement, credit or deduction whatsoever."

In any event, even if those provisions of the agreement should be interpreted as the city contends, this does not mean that its liability to make payments ends with a distribution of the funds collected to the date of the motion by means of the surcharge imposed by Ordinance No. 3444, nor even the charges to be collected in the future by reason of such surcharge. It is obvious from the face of that ordinance that there are other ordinances or other sections of an ordinance which require citizens to pay sanitation fees to the city. In other words, the city collects fees from the old ordinance and a surcharge under the new one. Thus, even if the city is obligated to make tipping fee payments only from sanitation funds, that obligation does not end when the funds raised by the surcharge are depleted. Instead, the obligation continues because, even the city's interpretation of the agreement, would require it to pay tipping fees out of any sanitation funds collected, including those collected under the old ordinance or any new ordinance enacted calling for payment of sanitation fees by its citizenry.

At page 505–506 of the Wright & Miller article cited above, the writer points out that, while interpleader will seldom be ren-

dered inappropriate because of the nature of the stake, "interpleader does require that a limited fund or some specific, identifiable property be involved so that claimants need the protection of one suit in which an equitable division can be reached." That simply does not exist in this case. Instead, what we have is an obligation undertaken by the City of Fayetteville to pay tipping charges out of sanitation funds collected from the citizens of Fayetteville raised not only by ordinance No. 3444 but any other ordinance requiring payment of such fees. There is not a specific fund of $541,187.29 about which all of the parties are fighting. That simply happens to be the amount of money that the City of Fayetteville had collected through the surcharge up to the date that the motion was made. That ordinance requires citizens of Fayetteville to pay in amounts specified by the ordinance on a monthly basis, and it will continue until the year 2003 unless it is declared invalid by this court or the chancery court. There is no common fund. Instead there is a long term exaction levied by Fayetteville on its citizens which the taxpayers contend is an illegal exaction. The citizens don't want the court to award them a common fund. They desire that the exaction be invalidated.

Those are the issues along with the issues about the validity of the other actions taken by the City of Fayetteville, which must be determined by some court, and an attempt to make this into a federal case by claiming interpleader is unavailing. At page 547 of the Wright & Miller article cited above, it is said:

> Of course, the district court should look closely at the bona fides of both the stakeholder's alleged interest and the threat of multiple vexation to insure that they have not been manufactured to obtain the benefit of the nationwide service of process, the lower jurisdictional amount, and the broader injunctive relief available under the interpleader statute.

It goes without saying that courts should give the same kind of scrutiny to an attempt by litigants to manufacture federal jurisdiction in a case that should be decided in state court.

That is especially true where there is already a state court proceeding moving toward trial in which all of the issues which the parties ask this court to determine can be determined in the forum provided by our national constitution and our republican form of government. As is stated a page 503 of the Wright & Miller article cited above: "If the court determines that a single action would not settle all the claims that are outstanding among the parties or that a state action commenced earlier provides an adequate remedy, then it may decide to deny the motion to interplead." For the reasons already stated, there is not even the slightest possibility that the acceptance of this case as an interpleader action and distribution of the sum that the City of Fayetteville wishes to pay into the registry of the court will end the vexatious and expensive litigation that has resulted from the Fayetteville incinerator project. Instead, all the court would be doing is transfer those issues and that litigation from the state court where the Constitution provides that it should be decided to this court for a decision here. Irrespective of how earnestly the governmental entities desire that this be done or how justified their wishes are, it is simply not appropriate or permitted unless this court disregards the clear directives imposed by our Constitution and federal law.

The issues are local in nature, involving state law and the state constitution, and there is a lack of complete diversity among the parties. Under those circumstances the local issues are to be decided in state court. An order will be entered dismissing this case for want of subject matter jurisdiction.