**FINANCIAL GUARANTY INSURANCE COMPANY, Appellant,**

v.

**The CITY OF FAYETTEVILLE, ARKANSAS; the City of West Fork, Arkansas; Washington County, Arkansas; Northwest Arkansas Resource Recovery Authority, Appellees,**

**Vickie Kelley; Katherine E. Barnhart; Carl Brooks (Cross–Claimants Below), Appellees,**

**Union National Bank, Little Rock, Arkansas (Cross–Claimant Below), Appellee.**

**No. 90–2808.**

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1991.

Decided Sept. 11, 1991.

Robert Rifkind, New York City, argued (Brian Frasier, New York City, and Larry Burks, Little Rock, Ark., on brief), for appellant.

Marshall Evans, Fayetteville, Ark., argued (Kent Hirsch, Springdale, Ark., on brief), for appellees.

Before BEAM, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and URBOM,* Senior District Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Financial Guaranty Insurance Company (FGIC) appeals the district court's [1] dismissal of this case for lack of jurisdiction. We affirm.

## I. BACKGROUND

The unique factual circumstances that gave rise to this litigation are extraordinarily important to our decision. We rely heavily on the district court's description of the events that precipitated this litigation.

In early 1980 some governmental units in Northwest Arkansas began considering alternatives to solid waste disposal in land fills. To this end, on August 30, 1980, the Northwest Arkansas Resource Recovery Authority ("the Authority") was formed pursuant to Arkansas law. The cities of Fayetteville and West Fork were the initial members of the Authority; Washington County became a member a short time later.

The purpose of the Authority was to finance, plan and construct an incinerator in which solid waste generated by the citizens of the governmental units would be burned. Initially, the plan was to use the heat generated by the incinerator to produce steam for sale to the University of Arkansas or other entities. When that plan did not materialize, it was decided that the heat would be used to

---

* The Honorable Warren K. Urbom, Senior United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

generate electricity and sales arrangements were made with public utilities in the area.

In 1985, the Quorum Court of Washington County and the governing bodies of the two cities approved ordinances which authorized the Authority to issue up to $25,000,000 in Solid Waste Management Revenue Bonds, Series 1985. On December 31, 1985, the Authority issued bonds totaling $22,405,000.00 with the proceeds to be used to finance the development and construction of the project. *Financial Guar. Ins. Co. v. City of Fayetteville*, 749 F.Supp. 934, 935 (W.D.Ark. 1990).

By early 1986, the Authority had selected a contractor to plan, build, and operate the facility. In late 1986, the City of Fayetteville had acquired a site for the project, and on December 30, 1986, the bonds were remarketed at a fixed rate and the proceeds were made available for use on the project.

As a condition to the issuance and remarketing of the bonds, [FGIC] insured repayment of the bonds. Under the policy, FGIC is obligated to pay any principal or interest on the bonds if the Authority does not pay such principal or interest when due. In that event, FGIC shall become the owner of the bonds evidencing the indebtedness paid or the right to payment of principal or interest on such bonds, and shall be fully subrogated to all of [the] bondholders' rights.

*Id.* at 936. As a further condition to the remarketing of the bonds, a memorandum, signed by Marian R. Orton, chairman of the Authority board and a member of Fayetteville's board of directors, was distributed to potential bond purchasers. The memorandum stated that the members of the Authority assumed responsibility for the Authority's expenses and financing requirements.

As a further condition of the issuance of the bonds and insurance policy, the Fayetteville City Attorney sent an opinion letter to the trustee, Union National Bank of Little Rock, stating

that the City of Fayetteville was unconditionally obligated under the terms of a contract known as the "Waste Supply Agreement" entered into on December 22, 1986, to charge, collect and pay from sanitation fund revenues all tipping fees due under the agreement not only owed as a result of the waste generated by the City of Fayetteville but also any such fees not paid by the other parties, and that this obligation continued whether the project was completed or functioning.

*Id.* Fayetteville, West Fork, and Washington County were parties to the Waste Supply Agreement (hereinafter "the agreement"), which also provided that the members of the Authority would deliver specified amounts of solid waste to the project and provided for the payment of tipping fees to the Authority. These tipping fees were the primary source of income to the Authority, and were to provide the funds from which the Authority would pay the principal and interest on the bonds.

Construction of the project was begun in early 1987 and in January of that year public opposition to the incinerator grew. Initially, the opposition focused on the location of the project, but, as public opposition increased, environmental concerns and the effect on Fayetteville sanitation rates became central issues in the controversy. Apparently in an effort to quell the public outcry which had reached shrill proportions by this point, the [A]uthority and the cities proposed and considered alternate sites for the project but, in each instance, that only served to shift the focus of the public opposition to other locations in the area. On October 8, 1987, the Authority directed the contractor to place a moratorium on all discretionary spending.

*Id.*

Throughout 1987, public opposition to the construction of an incinerator increased. Finally, a non-binding referendum was held in Fayetteville on March 8, 1988; fifty-seven percent of those voting voted against construction of the project. The next day, the Fayetteville board of directors elected to withdraw from the Authority. Two days after Fayetteville's withdrawal, the Authority voted to discontinue all work on

the project, and four days after that, the trustee, Union National Bank of Little Rock, informed the Authority and FGIC that a default (apparently, Fayetteville's withdrawal from the Authority) had occurred. By this time, over seven million dollars of the bond proceeds had been spent on unrecoverable costs.

[T]he City of Fayetteville agreed not only to pay the tipping fees which it was obligated to pay under the agreement, but also unconditionally guaranteed the tipping fee obligations assumed by Washington County and by West Fork. In § 401(e) of the agreement, the city agreed that its obligation to pay not only its tipping fees, but those of the other governmental units was "absolute and unconditional" and that they would be "maintained and collected without any offset, abatement, credit or deduction whatsoever."

Section 401(c) of the agreement provides that the obligation of the governmental units to pay the tipping fees shall be payable solely out of income received by the cities and the county from charges for the disposal of garbage and trash (sanitation fund revenues). However, because of an ambiguity in the agreement, it is not totally clear that the City of Fayetteville is obligated to pay tipping fees only out of sanitation revenue funds.

\* \* \* \* \* \*

In an attempt to fund these expenses and to repay the unrecoverable bond proceeds expended on the project, on August 15, 1989, the City of Fayetteville passed Ordinance No. 3444 which substantially raised the rates paid by its citizens for trash pickup and disposal. It appears from the ordinance that it supplements other ordinances or sections of ordinances which had previously been passed to authorize the collection of fees from its citizens for provision of these services. In other words, Ordinance No. 3444 appears to be, in effect, a surcharge on sanitation rates to collect funds to be utilized in paying the withdrawal ex-

penses. In fact, the ordinance specifically provides that that is the purpose of it.

\* \* \* \* \* \*

Passage of the ordinance and collection of the sanitation fee surcharge has caused the opposition of certain Fayetteville citizens to be shifted into multiple litigation in both state and federal courts. On August 28, 1989, a citizen filed a lawsuit in Washington County Chancery Court alleging, among other things, that the ordinance and the funds collected by it was an illegal exaction violative of certain provisions of the Arkansas [C]onstitution and Arkansas statutes. Since that time, it appears that that lawsuit has ballooned into an all encompassing claim by certain taxpayers and ratepayers, as alleged representatives of a class, that most of the actions ... taken by the City of Fayetteville were in violation of the Arkansas [C]onstitution and other applicable Arkansas law.

*Id.* at 937–38.

On May 25, 1990, FGIC filed suit against the Authority and the three governmental entities that formed the Authority. Count I of the suit sought a declaration that the agreement was valid and enforceable as to the governmental entities; Count II sought a declaration that the Authority was obligated to pay the trustee, and Count III alleged that, if the agreement was invalid, the governmental entities had breached warranties representing that the agreement was valid. FGIC further asked the district court to order the governmental units to pay the Authority and the Authority to pay the trustee, as required by the agreement, or in the alternative, damages for the breach of the warranties.

Fayetteville agreed with FGIC that the central issue was whether Fayetteville was obligated to pay the shortfall and whether Ordinance 3444 was valid pursuant to Arkansas law. Fayetteville also agreed that the ordinance was valid and that the city had a valid obligation to pay sums due under the bonds. The city's response also purports to be a "counterclaim and cross-claim," naming as defendants FGIC, the

trustee, and various residents, taxpayers and sanitation ratepayers of the City of Fayetteville, and purports to join the citizens together as a class. Fayetteville concluded by requesting "a declaratory judgment upholding Fayetteville's authority to pay the shortfall," "a declaratory judgment upholding the validity of Ordinance 3444," and "a declaratory judgment upholding Fayetteville's authority to use funds raised pursuant to Ordinance 3444 to pay the shortfall." Appellant's Appendix at 63–64.[2] All of this requested relief was the same as that requested by FGIC.

## II. DISCUSSION

We agree with the district court that this case contains a jurisdictional defect, but we employ a slightly different analytical approach in reaching this conclusion.[3] We affirm the district court because this case fails to present a case or controversy as required by Article III of the Constitution.

For there to be a case or controversy, a federal court must, at a minimum, be presented with opposing parties representing adverse interests. *Granville House, Inc. v. Department of Health, Educ. and Welfare*, 772 F.2d 451, 455 (8th Cir.1985); *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1975) (en banc), *cert. denied* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). The adversity requirement insures that a court is presented with opposing parties that are fairly motivated to diligently and effectively present the merits of all sides of the issues presented, thereby facilitating the court's efforts to reach the correct results. *See GTE Sylvania, Inc. v. Consumers Union of the United States*, 445 U.S. 375, 382–83, 100 S.Ct. 1194, 1199–200, 63 L.Ed.2d 467 (1980).[4]

FGIC's lawsuit, as originally filed, lacks the requisite adversity. Both FGIC and the original named defendants agree that the Authority was legally obligated to pay the trustee and that Fayetteville's efforts to raise the money necessary to meet this obligation conformed to the requirements of Arkansas law. *See Financial Guar.*, 749 F.Supp. at 942. Similarly, these entities all request an order from the court declaring that Fayetteville's efforts were legal. However, when the parties have no legal dispute, and when the parties request the same relief, there is no case or controversy as required by Article III and the court lacks jurisdiction to grant the requested relief. *Moore v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 47, 47–48, 91 S.Ct. 1292, 1293, 28 L.Ed.2d 590 (1971) (per curiam) (cited with approval in *GTE Sylvania*, 445 U.S. at 383, 100 S.Ct. at 1199).

FGIC relies on *Dilatish v. Highfill*, 140 F.2d 741 (8th Cir.), *cert. denied* 322 U.S.

---

**2.** Fayetteville's response also included a count sounding in interpleader, but the accompanying motion to deposit funds into the court was denied. *Financial Guar.*, 749 F.Supp. at 944–45. The attempted interpleader is not a subject of this appeal.

**3.** The district court was faced with multiple motions to intervene, crossclaim, and counterclaim (and multiple motions in opposition), all purporting to include (or exclude) the trustee and taxpayers and sanitation ratepayers of the City of Fayetteville. The court never ruled on any of these motions "because, through counterclaims and other means, all of the parties [mentioned] above [we]re unquestionably ... before the court." *Financial Guar.*, 749 F.Supp. at 939. The court realigned all the parties in order to accurately reflect their true interests and concluded that "on one side of the lawsuit ... are the taxpayers seeking to invalidate everything that has been done in respect to the incinerator project, and on the other side are the governmental entities and the insurance carrier seeking a declaration that those actions were valid." *Id.* at 942. The court then dismissed the suit because this alignment placed Arkansas citizens on both sides of the dispute, thereby destroying the requisite diversity of citizenship.

We are not convinced that the district court ever had proper jurisdiction of all the third parties and intervenors. We are also not convinced that the trustee was a necessary and indispensable party such that it should be included in the case at the expense of jurisdiction. We merely mention these concerns to explain why we do not follow the precise reasoning employed by the district court; our narrower holding today obviates the need to resolve these issues.

**4.** The case or controversy requirement does not change merely because FGIC seeks declaratory relief. *Vorbeck v. Schnicker*, 660 F.2d 1260, 1265 (8th Cir.1981), *cert. denied* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982).

742, 64 S.Ct. 1145, 88 L.Ed. 1575 (1944) and contends that a case or controversy exists merely because Fayetteville has not paid the trustee. In *Dilatish,* the defendant conceded the existence of the debt; however, this court determined that a case or controversy existed because "there was no evidence that the [defendant] was to share in or have any interest in the recovery the [plaintiff] might obtain in the action." *Id.* at 744. In contrast, the defendants in the case at bar have interests that are allied with FGIC's, and all parties seek to validate the legality of Fayetteville's actions. Furthermore, unlike the defendant in *Dilatish,* Fayetteville has requested the same relief as has FGIC; consequently, *Moore* and *GTE Sylvania* dictate that this case be dismissed for lack of a case or controversy.[5]

We might reach a different result if we were convinced that Fayetteville's position is a sham, adopted merely to defeat FGIC's opportunity to seek relief in federal court. However, we have no doubt that the shared interests between the plaintiffs and the defendants is genuine. FGIC obviously wants someone other than itself to pay the bondholders. Washington County and West Fork would obviously prefer that Fayetteville pay in their stead, as provided for in the agreement. Finally, the sincerity of Fayetteville's position cannot be doubted in light of its efforts to secure funds with which to pay the bondholders, and in light of its efforts to defend its actions in state court. Consequently, the district court is left with no party seriously contending that the agreement and Ordinance 3444 are not legal, and thus no true controversy is presented.

## III. CONCLUSION

The plaintiffs and defendants in this case share an identity of interests, as represented by their unanimity as to all relevant points of law and fact and their separate requests for the same relief. Consequent-

ly, there is no case or controversy as required by Article III of the Constitution, and the district court lacked jurisdiction to hear the case.

---

**5.** Our result does not change merely because Count III alleges a misrepresentation. First of all, before a court could award FGIC relief on this count, the court would have to ascertain the legality of Fayetteville's actions. As already indicated, FGIC and the governmental entities do not possess the constitutionally required adver-

sity necessary to allow the district court to decide the issue. Furthermore, we doubt that Arkansas law would allow FGIC to recover for the alleged misrepresentations because the representations regarded matters of law, not of fact. *See Adkins v. Hoskins,* 176 Ark. 565, 3 S.W.2d 322, 326 (1928).